[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-11520

_____

NOBLE PRESTIGE LIMITED,

Plaintiff-Appellee,

*versus*

CRAIG THOMAS GALLE,
individually,
PAUL HORN,
individually,
GALLE LAW GROUP, P.A.,
a Florida professional association,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 9:20-cv-82357-RS

_____

Before WILLIAM PRYOR, Chief Judge, LUCK*, and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

Noble Prestige Limited lent Paul Thomas Horn $500,000 to pursue litigation against a telecommunications company. Under the terms of the loan, Horn agreed to repay Noble $5,000,000, or 5% of the recovery from the litigation, whichever turned out to be greater. While the litigation was pending, however, a conservatorship over Horn's assets was commenced in a probate court in Denver, Colorado (the "Denver Probate Court"), due to a longstanding mental illness that interferes with Horn's ability to make his own decisions or convey his wishes to others. Horn's longtime counsel, Craig Thomas Galle, was appointed conservator and authorized to resolve the litigation on Horn's behalf. The case settled, and the proceeds were placed in the conservatorship estate, subject to Galle's management and the ultimate custody and control of the Denver Probate Court.

Following settlement, the Denver Probate Court refused to authorize the payment of $5,000,000 to Noble because of concerns

_____

* Judge Luck concurs in all but Section III.A.

it had about the enforceability of the loan agreement. So, Noble decided to arbitrate its dispute with Horn in Hong Kong, ultimately obtaining arbitral awards that required Horn to pay Noble the debt owed under the loan agreement and Galle to pay Noble costs associated with the arbitration.

With its international arbitral awards in hand, Noble moved to confirm the awards under the New York Convention in the United States District Court for the Southern District of Florida. Noble also sought a temporary restraining order prohibiting Galle, Horn, and Galle's law firm, Galle Law Group ("GLG"), from transferring, using, dissipating, or otherwise encumbering funds up to the amount owed to Noble under the arbitral awards. Galle and GLG (together, "Respondents") opposed Noble's request and moved to dismiss the action. The district court granted Noble's request, entering what it termed a "temporary restraining order" that prohibited Galle from dissipating or transferring $10,000,000 "notwithstanding any order(s) entered by the [Denver] Probate Court." The district court also entered an order granting Respondents' motion to dismiss in part and denying it in part. Now, Respondents appeal both orders.

After careful review and with the benefit of oral argument, we dismiss in part and vacate and remand in part. We do not have appellate jurisdiction to review the partial denial of the motion to dismiss. But we do have jurisdiction over the "temporary restraining order" because it was actually a preliminary injunction. We hold, however, that the injunction was improperly entered, and

therefore vacate that order and remand the matter to the district court for further proceedings consistent with this opinion.

## I.

## A.

The dispute giving rise to this litigation dates back to 2011, when Noble agreed to a Loan Facility Agreement ("Facility Agreement") with Horn to fund a dispute in which he was involved with AT&T.  Noble agreed to loan Horn $500,000, and, in exchange, Horn agreed to repay Noble $5,000,000 or 5% of Horn's eventual recovery (sometimes referred to by the parties as Horn's "Appreciated Value Interest"), whichever turned out to be greater.[1]  The Facility Agreement dictated that the parties would resolve any dispute arising out of the Agreement through arbitration in Hong Kong.

To secure repayment of its loan, Noble also obtained "a security interest (lien) in the sums paid by the ATT Parties to Horn on account of the Appreciated Value Interest" by entering into a "Security Agreement" with Horn.  The Security Agreement

---

[1] "Appreciated Value Interest," or "AVI," refers to the subject of Horn's dispute with AT&T: the value of Horn's interest in a cellular telecommunications system called "Colorado 3."  Horn's 1991 Assignment Agreement sold Horn's interest in Colorado 3 to a predecessor of AT&T, and the Assignment Agreement styled the payment owed to Horn as his "AVI."  The later Facility Agreement between Horn and Noble tracked this language.

limited the amount of the lien to "those portion[s] of the funds that equal the sums due Noble under the [Facility] Agreement."

Noble disbursed the loan principal to Horn between December 2011 and February 2014. However, AT&T and Horn were unable to resolve their dispute informally so, in 2014, Horn sued AT&T in a Colorado state court (the "AT&T litigation").

**B.**

Horn suffers from a mental illness known as Functional Neurological Deficit, also commonly referred to as Conversion Disorder, which causes various neurological impairments in those afflicted. Because of the impact this illness has on Horn's ability to make his own decisions, in 2017, while the AT&T litigation was pending, a conservatorship proceeding was instituted in the Denver Probate Court (the "Conservatorship") to ensure that any proceeds owed to Horn from the AT&T litigation would not be wasted or lost.

The Colorado Probate Code authorizes the State's probate courts to institute a conservatorship to manage the estate of an adult if, after notice and hearing, the probate court determines (1) by clear and convincing evidence that "the individual is unable to manage property and business affairs because the individual is unable to effectively receive or evaluate information or both or to make or communicate decisions . . . or because the individual is missing, detained, or unable to return to the United States," and (2) by a preponderance of the evidence, that "the individual has property that will be wasted or dissipated unless management is

provided . . . ." Colo. Rev. Stat. § 15-14-401(1)(b) (2023). Based on expert opinion reports authored by Horn's psychiatrist and neurologist, as well as testimony provided by a clinical psychologist at an evidentiary hearing, the Denver Probate Court concluded that Horn was "incapable of making decisions concerning his lawsuit," "incapable of communicating, giving input or direction, or responding clearly with his Counsel and other professionals assisting him," and "lacks the ability to make simple decisions." Because "substantial assets belonging to Mr. Horn [would] be wasted, if not lost," the Probate Court entered an order appointing Galle as "Special Conservator" to "make any and all decisions concerning" the AT&T litigation. *See* Colo. Rev. Stat. § 15-14-412(3)(a) (2023). The Probate Court also appointed a guardian *ad litem*, James Britt, to represent and protect the best interests of Horn and report to the Probate Court as necessary.

Following his appointment as Special Conservator, Galle agreed to settle the AT&T litigation on Horn's behalf for $57,500,000, and the Denver Probate Court approved the settlement on August 23, 2017. The settlement proceeds (the "AT&T settlement funds") were paid into Horn's estate, and placed in accounts managed by Galle in his capacity as Special Conservator, subject to the ultimate control of the Denver Probate Court. As of September 2021, the Conservatorship estate contained funds exceeding $30,000,000.

Around two months after the AT&T litigation settled, in November 2017, Noble sought payment of the $5,000,000 it

claimed it was owed under the Facility Agreement. The Denver Probate Court had authorized Galle, as Special Conservator, to pay certain expenditures and debts of Horn's using the AT&T settlement funds, but expressly denied him permission to pay Noble because of questions it had regarding the Facility Agreement's enforceability (given Horn's mental state) and the potentially "usurious" nature of the loan (inasmuch as that payment would net Noble $4,500,000 on a $500,000 loan). Britt, the guardian *ad litem*, offered to pay Noble $2 million to resolve its claim against Horn's estate, but Noble rejected this offer. Instead, Noble filed for arbitration against Horn in the Hong Kong International Arbitration Centre ("HKIAC"), under the terms of the Facility Agreement, seeking to collect on the debt.

Once Galle learned of the arbitration in January 2018, he sought, and the Denver Probate Court granted him, specific authorization to represent Horn's interests in the arbitration and to hire local Hong Kong counsel. Then, on March 21, 2018, the Denver Probate Court issued an order (the "Conservatorship Order") terminating all of Horn's pre-existing financial powers of attorney and broadening the scope of Galle's authority to that of a general Conservator -- tasking him with managing Horn's estate in Horn's best interest and empowering him to take a variety of different actions on behalf of the estate under Colorado law. *See* Colo. Rev. Stat. §§ 15-10-201(9) (2023), 15-14-411 (2023), 15-14-425 (2023). The Probate Court reiterated its finding that Horn was "unable to manage property and business affairs because of an inability to effectively receive or evaluate information or both or to make or

communicate decisions." The Probate Court further found that Horn was "missing, detained, or unable to return to the United States." According to an affidavit submitted by Galle, Horn has not resided in the United States since at least 1996 and was last known to have resided in Thailand.

## C.

Having obtained authorization from the Denver Probate Court to represent Horn's interests in the HKIAC arbitration, Galle made an appearance before the arbitral tribunal and, through local counsel, filed an answer on Horn's behalf. The tribunal (the "HKIAC Tribunal") concluded, however, that the orders of the Denver Probate Court authorizing Galle to represent Horn in the arbitration were insufficient to convey that authority as a matter of Hong Kong Law, and, on March 29, 2019, issued an "Interim Award" prohibiting Galle from further participation in the arbitration "until such time as proper authority is obtained." In a separate award, the HKIAC Tribunal also ordered Galle to pay Noble's costs incurred in resolving the issue of Galle's authority, which totaled HK$3,250,000, plus interest (the "Partial Award on Costs").

The arbitration continued without an appearance by Horn or any other party authorized to represent him. Nevertheless, on May 14, 2020, the HKIAC Tribunal entered a "Final Award" against Horn that, among other things, ordered him to pay Noble "the sum of US$5,000,000 due as a debt under the Facility Agreement, alternatively as damages for breach of the Facility Agreement," plus

attorneys' fees, costs of HK$3,800,530.05, and prejudgment and postjudgment interest.

## D.

With the Interim Award, Partial Award on Costs, and Final Award (together, the "Arbitral Awards") in hand, Noble filed a petition to "[c]onfirm and [e]nforce" the Awards in the United States District Court for the Southern District of Florida on December 18, 2020 (the "Petition"). Noble named Horn, GLG, and "Galle, individually," as Respondents, and sought a judgment confirming the three Arbitral Awards and awarding the sums set forth in those Awards, a temporary restraining order "in the form to be submitted to the Court," and "such other relief as this Court deems just and proper, including costs."

On December 21, 2020, Noble filed an *ex parte* application for a temporary restraining order prohibiting Respondents from transferring "all monies held or received by Respondents, or other financial institutions, for the benefit of any or more of the Respondents, and any financial accounts tied thereto, up to the amounts under the Final Award . . . and the Partial Award on Costs," and for an expedited hearing for a preliminary injunction. Noble's application calculated that, as of December 18, 2020, the total amount owed to Noble by Horn and Galle was $7,075,917.81, with an additional $1,470.42 in interest accruing daily.

Galle and GLG appeared in the action, filed a response to the *ex parte* application, and moved to dismiss the Petition on several grounds, including that the district court lacked subject matter

jurisdiction over GLG and Galle, individually, because neither had signed an arbitration agreement with Noble. Noble opposed the motion to dismiss and filed a reply in support of its *ex parte* application.

The district court scheduled a hearing on Noble's *ex parte* application (though it referred to the application as a "Motion for Preliminary Injunction") and Respondents' motion to dismiss for September 17, 2021. At the hearing, the district court took argument from all parties regarding the motion to dismiss. However, the court only permitted Noble to present argument on its request for preliminary injunctive relief; Respondents were not allowed to present argument before the district court granted Noble's request. The district court entered two orders. First, it granted in part and denied in part the Respondents' motion to dismiss. As relevant here, the district court denied the motion to dismiss Noble's claims against Galle individually because Galle had voluntarily participated in the HKIAC arbitration proceedings and, thus, the court had subject matter jurisdiction over Noble's claims to confirm and enforce the Arbitral Awards against him.

Second, the district court entered an order granting Noble's request for a "temporary restraining order." The district court ordered Galle and GLG, "notwithstanding any order(s) entered by the Probate Court in *In the Matter of: Paul Clayton Horn*, Case no. 2017-PR-30071," not to "dissipate, transfer, send, sequester, or deplete, or cause or permit the dissipation, transfer, sending, sequestration, or depletion of, the sum of US$ 10,000,000 [sic] from amount

remaining of the payment in respect of Horn's AVI."  The district court did not consider whether to require Noble to post a bond, and did not specify any end date for the "temporary restraining order."

Respondents timely appealed, challenging the entry of both orders.  Because the district court had only granted Respondents' motion to dismiss in part, and the district court had labeled its injunctive order a "temporary restraining order," this Court ordered the parties to file jurisdictional briefs setting forth the basis for appellate jurisdiction.  A panel of this Court construed Noble's response as a motion to dismiss, but denied the motion, concluding that, although the district court had styled its injunction as a temporary restraining order, it was, in reality, a preliminary injunction and therefore immediately appealable.  *See* 28 U.S.C. § 1292(a)(1).  The panel further concluded that the Court has pendent appellate jurisdiction over Noble's claims against Galle, individually, as the district court had concluded in its dismissal order.

## II.

We review questions of our jurisdiction, as well as the district court's subject matter jurisdiction, *de novo*.  *United States v. Amodeo*, 916 F.3d 967, 970 (11th Cir. 2019); *Rubinstein v. Yehuda*, 38 F.4th 982, 992 (11th Cir. 2022).  We review the district court's grant of a preliminary injunction for abuse of discretion.  *Lebron v. Sec'y, Fla. Dep't of Child. & Fams.*, 710 F.3d 1202, 1206 (11th Cir. 2013).  But we review underlying questions of law, including the proper interpretation of the Federal Rules of Civil Procedure, *de novo*.  *Id.*;

*Mega Life & Health Ins. Co. v. Pieniozek*, 585 F.3d 1399, 1403 (11th Cir. 2009).

Our analysis begins, at it must, with the issue of our jurisdiction to hear this appeal. *See Peppers v. Cobb County*, 835 F.3d 1289, 1296 (11th Cir. 2016). We have jurisdiction over "appeals from all final decisions of the district courts of the United States." 28 U.S.C. § 1291. A decision "is considered final and appealable only if it ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *W.R. Huff Asset Mgmt. Co. v. Kohlberg, Kravis, Roberts & Co.*, 566 F.3d 979, 984 (11th Cir. 2009). If the decision "does not end the litigation, it must come within an exception to the final judgment rule to be reviewable on appeal." *Farr v. Heckler*, 729 F.2d 1426, 1427 (11th Cir. 1984) (per curiam). Some of these exceptions are found in decisions of this Court and the Supreme Court; others are provided by statute. *See, e.g.*, *Jenkins v. Prime Ins.*, 32 F.4th 1343, 1345-46 (11th Cir. 2022). As relevant here, the courts of appeals have jurisdiction over appeals from "[i]nterlocutory orders of the district courts . . . granting . . . injunctions." 28 U.S.C. § 1292(a)(1).

Noble urges us to dismiss this appeal because neither appealed order terminates the litigation in its entirety, and neither order falls within any of the recognized exceptions. While Congress has granted this Court jurisdiction to hear appeals from preliminary injunctions, the injunctive order entered by the district court was, according to Noble, a temporary restraining order, not a preliminary injunction, and this Court has held that temporary

restraining orders are not immediately appealable under 28 U.S.C. § 1292(a)(1).  *McDougald v. Jenson*, 786 F.2d 1465, 1472 (11th Cir. 1986).  Thus, the argument goes, we lack the power to entertain Respondents' appeal.

Noble is undoubtedly correct that "[i]t is well settled in this circuit that a TRO is not ordinarily appealable."  *Id.*  But just because the district court labeled its order a "temporary restraining order" does not make it so.  "[T]he label placed on [such] an order . . . is not dispositive of its nature and appealability under section 1292(a)(1)."  *Id.*  Rather, we look to three factors to determine whether an interlocutory injunctive order is immediately appealable as a preliminary injunction: whether "(1) the duration of the relief sought or granted exceeds that allowed by a TRO (ten days), (2) the notice and hearing sought or afforded suggest that the relief sought was a preliminary injunction, and (3) the requested relief seeks to change the status quo."  *AT&T Broadband v. Tech Commc'ns, Inc.*, 381 F.3d 1309, 1314 (11th Cir. 2004).

Applying these factors, it is clear that Respondents have appealed from a preliminary injunction, not a temporary restraining order.  The district court did not temporally limit the order in any way.  The order had no ending date.  Moreover, Respondents opposed Noble's motion by filing a brief and by appearing at the district court's hearing, and the court's order plainly altered the status quo by placing restrictions on Galle's authority as Conservator of the funds subject to the Conservatorship.  *See id.*  We therefore have jurisdiction to review the district court's injunctive order.

We do not, however, have jurisdiction over the district court's dismissal order. That order dismissed Noble's claims against GLG, but left Noble's claims against the other Respondents pending. So the order obviously did not "end[] the litigation on the merits and leave[] nothing for the court to do but execute the judgment." *W.R. Huff*, 566 F.3d at 984. Nor does the dismissal order fall into any other identifiable category of interlocutory order that would be immediately appealable. *Contra* 28 U.S.C. § 1292; *Jenkins*, 32 F.4th at 1345-46.

Nevertheless, Respondents contend that we may exercise our discretion to review the dismissal order under the doctrine of pendent appellate jurisdiction. Though a panel of this Court previously agreed, upon further review and with the benefit of oral argument, we now conclude that we cannot exercise pendent appellate jurisdiction over the district court's motion to dismiss. *See* 11th Cir. R. 27-1(g) ("A ruling on a motion or other interlocutory matter, whether entered by a single judge or a panel, is not binding upon the panel to which the appeal is assigned on the merits, and the merits panel may alter, amend, or vacate it.").

The doctrine of pendent appellate jurisdiction allows us to review certain decisions that are not typically appealable "if the non-appealable matters are 'inextricably intertwined with an appealable decision or if review of the former decision is necessary to ensure meaningful review of the latter.'" *Smith v. LePage*, 834 F.3d 1285, 1292 (11th Cir. 2016) (quoting *Jackson v. Humphrey*, 776 F.3d 1232, 1239 (11th Cir. 2015)). The doctrine does not apply here,

though, because the issue of the district court's subject matter jurisdiction over Noble's claims against Galle, individually, is neither inextricably intertwined with nor necessary to ensure meaningful review of Respondents' challenges to the district court's preliminary injunction. *See Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1335-36 (11th Cir. 1999) (holding that the portion of a district court's order denying a motion to dismiss on standing grounds was not "inextricably intertwined with" or "necessary to ensure meaningful review of" another portion of the order denying a motion on Eleventh Amendment grounds, because the appellant's standing arguments were "completely irrelevant to" their Eleventh Amendment arguments) (internal quotation marks omitted).

The preliminary injunction prohibits Galle from transferring, spending, or diverting funds that are held in Conservatorship accounts and are subject to the jurisdiction of the Denver Probate Court. Thus, the preliminary injunction necessarily runs against Galle only in his capacity as Conservator -- not against him individually. So even if we were to conclude that the district court lacked jurisdiction over Noble's claims against Galle in his individual capacity, that finding would have no bearing on the district court's authority to enter a preliminary injunction against Galle as Conservator. Put simply, we need not resolve the jurisdictional question to resolve the issues raised about the lawfulness of the district court's preliminary injunction. *See id.*; *see also Moniz v. City of Fort Lauderdale*, 145 F.3d 1278, 1281 n.3 (11th Cir. 1998) (holding that we lacked pendent appellate jurisdiction to review standing issue

where the appellants had properly appealed the district court's rejection of their qualified immunity defense).

Because we cannot assert pendent appellate jurisdiction over the district court's dismissal order, we dismiss Respondents' appeal insofar as it challenges the district court's denial of the motion to dismiss, and vacate the prior panel's order to the extent it is inconsistent with that conclusion.

## III.

We turn then to the merits of Respondents' challenges to the district court's preliminary injunction. We hold that the injunction must be vacated for two separate and independent reasons, either of which would, standing alone, require vacatur. *First*, the district court was barred from entering the order under the doctrine of "prior exclusive jurisdiction." And *second*, the district court lacked the authority to issue preliminary injunctive relief freezing Respondents' assets under Federal Rule of Civil Procedure 65.[2]

## A.

At the outset, we address whether the district court had the power to enter a preliminary injunction restraining $10,000,000 of

---

[2] Respondents also argue that the district court abused its discretion in issuing preliminary injunctive relief for two separate reasons: (1) Noble failed to establish that it would suffer irreparable harm absent entry of an injunction, and (2) the district court failed to even consider whether to require Noble to post a bond before issuing the injunction. Because we hold that the district court lacked the power to issue the injunction in the first place, we have no occasion to reach these arguments.

the AT&T settlement funds. Respondents first challenge the injunction on the ground that, under the doctrine of "prior exclusive jurisdiction" (also sometimes referred to as *Princess Lida* abstention), the district court was barred from entering an order that sought to assert jurisdiction and control over funds that are already under the exclusive jurisdiction and control of the Denver Probate Court. *See Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456, 466 (1939). We agree.

### 1.

Under the "ancient and oft-repeated doctrine of prior exclusive jurisdiction," when "a court of competent jurisdiction has obtained possession, custody, or control of particular property, that possession may not be disturbed by any other court." *Applied Underwriters, Inc. v. Lara*, 37 F.4th 579, 591 (9th Cir. 2022) (alteration adopted) (citation omitted). Put another way, once one court has properly asserted *in rem* jurisdiction over a *res*, other courts are "precluded from exercising [their] jurisdiction over the same res to defeat or impair the [first] court's jurisdiction." *Kline v. Burke Constr. Co.*, 260 U.S. 226, 229 (1922); *see also Princess Lida*, 305 U.S. at 466 ("[I]f the two suits are in rem, or quasi in rem, so that the court, or its officer, has possession or must have control of the property which is the subject of the litigation in order to proceed with the cause and grant the relief sought the jurisdiction of the one court must yield to that of the other."); 13F Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3631 & n.16 (3d ed. 2023) ("[W]hen a state or federal court of competent jurisdiction has obtained possession, custody, or control of particular property,

that authority and power over the property may not be disturbed by any other court.") (collecting cases).

This rule serves an important function in our federal system of government: where two separate courts must navigate their independent -- and sometimes overlapping -- jurisdictions, the rule helps avoid the needless conflict that comes when one court attempts to interfere with the valid process of another. *See Covell v. Heyman*, 111 U.S. 176, 182 (1884). But the prior exclusive jurisdiction doctrine is not merely a "principle of comity." *Id.* As the Supreme Court explained over a century ago, "between state courts and those of the United States, it is something more. It is a principle of right and of law, and therefore of necessity. It leaves nothing to discretion or mere convenience." *Id.*

> [W]hen one takes into its jurisdiction a specific thing, that *res* is as much withdrawn from the judicial power of the other as if it had been carried physically into a different territorial sovereignty. To attempt to seize it by a foreign process is futile and void. . . . No judicial process, whatever form it may assume, can have any lawful authority outside of the limits of the jurisdiction of the court or judge by whom it is issued; and any attempt to enforce it beyond these boundaries is nothing less th[a]n lawless violence.

*Id.* at 182-83.

Thus, the doctrine operates to bar a subsequent court's assertion of *in rem* jurisdiction over a *res* that would interfere with a

prior court's exclusive control of that *res*.  *See United States v. $270,000 in U.S. Currency, Plus Interest*, 1 F.3d 1146, 1147-48 (11th Cir. 1993) (per curiam) (citing *Kline*, 260 U.S. at 229); *Applied Underwriters*, 37 F.4th at 591 (same); *United States v. One Parcel Property Located at Lot 85*, 100 F.3d 740, 742 (10th Cir. 1996) (citing *Princess Lida*, 305 U.S. at 465-66).  The doctrine extends even to cases in which property has not "been actually seized under judicial process before a second suit is instituted."  *United States v. Bank of N.Y. & Tr. Co.*, 296 U.S. 463, 477 (1936).  "It applies as well where suits are brought to marshal assets, administer trusts, or liquidate estates, and in suits of a similar nature" -- in other words, cases "where, to give effect to its jurisdiction, the court must control the property."  *Id.*; *accord Kline*, 260 U.S. at 231-32; *Applied Underwriters*, 37 F.4th at 591-93.

Notably, however, this does not mean that the doctrine reaches so far as to bar *any* exercise of jurisdiction related to a *res* that is already under another court's control.

> Where the judgment sought is strictly in personam, for the recovery of money or for an injunction compelling or restraining action by the defendant, both a state court and a federal court having concurrent jurisdiction may proceed with the litigation, at least until judgment is obtained in one court which may be set up as res []judicata in the other.

*Penn Gen. Cas. Co. v. Pennsylvania ex rel. Schnader*, 294 U.S. 189, 195 (1935); *accord Markham v. Allen*, 326 U.S. 490, 494 (1946) (collecting

cases); *see also United States v. Certified Indus., Inc.*, 361 F.2d 857, 860 (2d Cir. 1966) (quoting *Markham*, 326 U.S. at 494); *Citibank, N.A. v. Data Lease Fin. Corp.*, 645 F.2d 333, 338-39 (5th Cir. Unit B May 1981)[3] (citing *Kline*, 260 U.S. at 229); *Lot 85*, 100 F.3d at 743 (quoting *Penn Gen.*, 294 U.S. at 198); *State Eng'r v. S. Fork Band of Te-Moak Tribe of W. Shoshone Indians*, 339 F.3d 804, 811 (9th Cir. 2003) (quoting *Penn Gen.*, 294 U.S. at 195); *Goncalves ex rel. Goncalves v. Rady Child.'s Hosp. San Diego*, 865 F.3d 1237, 1254 (9th Cir. 2017) (same).

The Supreme Court's decision in *Penn General* provides a useful illustration of the doctrine's scope. There, shareholders of an insolvent insurance company brought suit in federal district court alleging that the company's officers had misappropriated funds and seeking the appointment of a receiver to liquidate the company and distribute its assets. *Penn Gen.*, 294 U.S. at 191-92. Shortly thereafter, Pennsylvania's Attorney General filed a similar suit in state court, seeking an order taking the assets of the company into the possession of the insurance commissioner for liquidation. *Id.* at 192. Nearly simultaneously, the two courts issued competing preliminary injunctions prohibiting the company and its officers or agents from transacting any business and from disposing of the company's property and enjoining all other persons from interfering with the company in any way. *Id.* at 192-93. The state-court action eventually proceeded to judgment, resulting in a

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

final decree directing the acting insurance commissioner to take possession of and liquidate the company's assets. *Id.* at 193. After the insurance company refused to comply, citing the conflicting preliminary injunction issued by the federal district court, the State's Attorney General appealed to the Pennsylvania Supreme Court, which affirmed the state court's decree. *Id.*

The U.S. Supreme Court then granted certiorari to resolve the "impasse" between the federal and state courts, each of which had attempted to assert jurisdiction over the same subject matter -- "the liquidation of the business, and assets of the insolvent corporation" -- and each of which was "unable to perform its function without acquiring possession and control of the property." *Id.* at 190-91, 194. The Court determined that the federal court had first acquired jurisdiction over the *res* because the federal plaintiffs had filed their complaint before the Pennsylvania Attorney General initiated the state-court action. *Id.* at 196-97. As a result, the federal district court "alone c[ould] rightfully assert control over the property and proceed with litigation which affects that control, and it alone c[ould] determine how far it w[ould] permit any other court to interfere." *Id.* at 197 (citations omitted).

That did not mean, however, that the state court was entirely denuded of the power to entertain an action concerning the insurance company. The Supreme Court explained that the state court could still "make orders which do not conflict with the authority of the court having jurisdiction over the control and disposition of the property," such as ordering a receiver to surrender

property to the court having prior jurisdiction or to "take possession and proceed with the liquidation when the court having jurisdiction over the property relinquishes it." *Id.* at 198. But the federal court's prior assertion of jurisdiction over the insolvent company and its assets deprived the state court of the power to enter orders that would disturb the federal court's exclusive control, including the injunction which prohibited the company from disposing of its assets and prohibited others from taking possession of them. *See id.* at 198-99. The Supreme Court therefore concluded that Pennsylvania's high court had "erred in affirming" the orders "direct[ing] the insurance commissioner to take possession of the business and property of the company," "enjoin[ing] the company from surrendering its books, records, and assets to any person other than the commissioner, and enjoin[ing] others from taking possession of them." *Id.* at 199; *see also $270,000 in U.S. Currency*, 1 F.3d at 1149; *Certified Indus.*, 361 F.2d at 860; *Applied Underwriters*, 37 F.4th at 591-92.

Applying these principles to the case before us, it is clear, as an initial matter, that the Conservatorship predates the federal district court action. The Conservatorship commenced on March 7, 2017, several years before Noble moved to confirm the Arbitral Awards in federal district court in late 2020. So, if the Conservatorship is in fact an *in rem* proceeding, the prior exclusive jurisdiction rule would bar the district court from entering any order that asserts *in rem* jurisdiction over Conservatorship assets, thereby disturbing the Denver Probate Court's exclusive control of the *res*. *See Penn Gen.*, 294 U.S. at 199.

There can be no question that the Denver Probate Court has asserted *in rem* jurisdiction over the assets of the Conservatorship estate. Indeed, counsel for Noble conceded this point at oral argument in our Court. Oral Argument at 15:45-16:02. Under Colorado law, once a conservatorship has commenced, the probate court obtains "[e]xclusive jurisdiction" over the protected person's estate "to determine how [that] estate . . . must be managed, expended, or distributed." Colo. Rev. Stat. § 15-14-402(1)(b) (2023). While the probate court "may appoint a limited or unlimited conservator" to manage the estate and take certain actions on behalf of the protected person for his or her benefit, *see id.* §§ 15-14-401(1) (2023), 15-10-201(9) (2023), 15-14-411 (2023), 15-14-425 (2023), the assets of the estate remain subject to the ultimate custody and control of the probate court, which may exercise "all the powers over the estate and business affairs of the protected person that the person could exercise if the person were an adult, present, and not under conservatorship or other protective order." Colo. Rev. Stat. § 15-14-410(1)(b) (2023). Thus, "to give effect to its jurisdiction, the court must control the property." *Bank of New York*, 296 U.S. at 477 (concluding that state court liquidation proceeding in which assets of insurance company had been vested in a statutory liquidator was *in rem*); *see Black v. Black*, 482 P.3d 460, 474-75 (Colo. App. 2020) (noting that Colorado probate courts exercise *in rem* jurisdiction over assets of the conservatorship estate); *Applied Underwriters*, 37 F.4th at 592 (concluding that state court conservatorship proceeding in which assets of insurance company had been vested in state insurance commissioner subject to probate court's control was *in rem*).

As a consequence, the Denver Probate Court "alone can rightfully assert control over the property" that makes up the Conservatorship estate. *Penn Gen.*, 294 U.S. at 197. Yet, here, the district court entered a preliminary injunction ordering Galle not to "dissipate, transfer, send, sequester, or deplete, or cause or permit the dissipation, transfer, sending, sequestration, or depletion of, the sum of US$ 10,000,000 [sic] from amount remaining of the payment in respect of Horn's AVI," "notwithstanding any order(s) entered by the Probate Court in *In the Matter of: Paul Clayton Horn*, Case no. 2017-PR-30071." To give effect to its order, the federal district court would have to assert control over the $10,000,000 "from [the] amount remaining of the payment in respect to Horn's AVI" -- in other words, the AT&T settlement funds. *See Bank of New York*, 296 U.S. at 477. Because these funds are part of the Conservatorship estate, the district court's order prohibits Galle from taking any action with respect to funds that are properly within the custody and control of the Denver Probate Court. *See Penn Gen.*, 294 U.S. at 197. Under the prior exclusive jurisdiction doctrine, the district court's entry of the preliminary injunction represents an assertion of *in rem* jurisdiction that the court was powerless to make. *See id.* at 199.

Of course, the prior exclusive jurisdiction doctrine does not dictate that Noble's action be dismissed. After all, Noble's underlying Petition seeks to confirm and enforce Arbitral Awards that provide *in personam* relief against Respondents; the Awards order Respondents to pay Noble monetary sums without any reference to a discrete *res*. Thus, the district court properly retains jurisdiction to

entertain Noble's claims for *in personam* relief. *See id*. at 198. But, because the district court reached beyond the scope of the *in personam* action filed by Noble to enter a preliminary injunction that asserted control over a *res* already subject to the exclusive control of the Denver Probate Court, that order must be vacated. *See id*. at 199; *Farmers' Loan & Tr. Co. v. Lake St. Elevated R.R. Co.*, 177 U.S. 51, 62 (1900) (holding that state court erred by "enjoining and restraining" party from "proceeding with or prosecuting . . . foreclosure suit in the circuit court of the United States" because the federal court had first acquired jurisdiction over the property upon filing of complaint seeking foreclosure); *Certified Indus.*, 361 F.2d at 862 (holding that district court's entry of preliminary injunction that "directly interfere[d] with and [was] in conflict with disposition of the fund under control of the state court" was error); *$270,000 in U.S. Currency*, 1 F.3d at 1149 (vacating district court's forfeiture order on prior exclusive jurisdiction ground where state court had not yet relinquished its *in rem* jurisdiction over property by "enter[ing] a final order disposing of the property").

**2.**

Noble offers two rejoinders, but neither saves the injunction.

First, Noble argues that Respondents waived their prior exclusive jurisdiction argument by failing to raise it in the district court. To preserve an issue for appeal, "a party must 'clearly present it to the district court . . . in such a way as to afford the district court an opportunity to recognize and rule on it.'" *Belevich v.*

*Thomas*, 17 F.4th 1048, 1051 n.1 (11th Cir. 2021) (alteration in *Belevich*) (quoting *In re Pan Am. World Airways, Inc.*, 905 F.2d 1457, 1462 (11th Cir. 1990)).  Contrary to Noble's argument, however, Respondents repeatedly argued that the Denver Probate Court had exclusive jurisdiction and control over the AT&T settlement funds.

In their brief opposing Noble's request for a temporary restraining order, under the heading "Jurisdiction," Respondents said that the district court "must abstain from exercising jurisdiction over funds held under the control and supervision of the Denver Probate Court" because the Conservator, like "a trustee in bankruptcy or a receiver, holds property 'in custodia legis.'"  Respondents expressly asserted that "[a]ny injunctive relief in this case against the Conservator would affect the Probate Court's exclusive jurisdiction of the Horn assets."  And, at the district court hearing on Noble's motion, counsel for Respondents argued that "we have disputed the entry of any type of . . . preliminary injunction tying up these funds that are in the custody of the Denver probate court."  While Respondents did not specifically direct the district court to the *Princess Lida* case or refer to their argument as "*Princess Lida* abstention," that omission is of no moment.  A party is obviously not limited to citing the same authority or offering the same argument on appeal as it did before the district court, as long as the new authority or argument is still offered in support of an *issue* that has been properly preserved.  *See Pugliese v. Pukka Dev., Inc.*, 550 F.3d 1299, 1304 n.3 (11th Cir. 2008) ("Although new claims or issues may not be raised, new *arguments* relating to preserved claims may be reviewed on appeal." (emphasis in original)).  Respondents'

submissions were more than sufficient to put the district court squarely on notice of Respondents' prior exclusive jurisdiction argument and to give the court the opportunity to rule on it. *See Belevich*, 17 F.4th at 1051 n.1.

Next, Noble argues that the Constitution's Supremacy Clause bars application of the prior exclusive jurisdiction doctrine. Noble's Petition ultimately seeks to confirm and enforce the Awards under the New York Convention. Because the New York Convention is incorporated into federal law by the Federal Arbitration Act, and, under the Supremacy Clause, federal law reigns supreme over state law, Noble reasons that any "purported exclusive jurisdiction of the Denver Probate Court, . . . purported application of Colorado probate law, [or] purported doctrines of abstention and deference to state probate[] courts, etc. ha[s] no application here."

Whether the district court had the power to issue preliminary injunctive relief that would interfere with the Denver Probate Court's prior exclusive jurisdiction over the AT&T settlement funds does not implicate any conflict between the New York Convention and state law, or any other law for that matter. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1479 (2018) (noting that the Supremacy Clause "simply provides 'a rule of decision'" and "specifies that federal law is supreme in case of a conflict with state law" (citation omitted)). If anything, the prior exclusive jurisdiction doctrine implicates potential conflicts between the exercise of jurisdiction of state courts and federal courts over a *res* -- not

conflicts between state and federal law.  Noble does not explain how or why the Supremacy Clause would prevent the district court from asserting jurisdiction in light of the state court's prior exclusive jurisdiction over the *res*, simply because the underlying federal action has been brought under the New York Convention. Nor does it offer any authority standing for that proposition.

Under the doctrine of prior exclusive jurisdiction, the district court's entry of preliminary injunctive relief over the AT&T settlement funds must be vacated.

### B.

Next, we consider Respondents' alternate and independent argument that the district court improperly granted a preliminary injunction under Federal Rule of Civil Procedure 65.  We conclude that, since Noble's Petition seeks only legal (not equitable) relief, the district court lacked the power to issue preliminary injunctive relief freezing Respondents' assets pursuant to Rule 65.

### 1.

"It is axiomatic that equitable relief is only available where there is no adequate remedy at law; cases in which the remedy sought is the recovery of money damages do not fall within the jurisdiction of equity." *Rosen v. Cascade Int'l, Inc.*, 21 F.3d 1520, 1527 (11th Cir. 1994).  Relying on this "fundamental principle of equity jurisprudence," we have often explained that "'a court may not reach a defendant's assets unrelated to the underlying litigation and freeze them so that they may be preserved to satisfy a potential money judgment.'"  *Id.* (quoting *Mitsubishi Int'l Corp. v. Cardinal*

*Textile Sales, Inc.*, 14 F.3d 1507, 1521 (11th Cir. 1994)). In other words, in "[c]ases in which the remedy sought is the recovery of money (whether as collection on a debt or as damages)," a district court is powerless to grant preliminary injunctive relief under Rule 65 because the plaintiff's claims "do not fall within the jurisdiction of equity," *Mitsubishi*, 14 F.3d at 1518, and "preliminary injunctive relief [is] of a different 'character' from the final relief sought and obtainable in the litigation (the prohibition of certain conduct, not the payment of money damages)," *Rosen*, 21 F.3d at 1528 (quoting *De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 220 (1945)). *See Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 333 (1999).

That is precisely the case here. The district court lacked the authority to enter a preliminary injunction under Rule 65 because Noble's Petition has not asserted any equitable claims nor does it ultimately seek any equitable relief. The Petition lists two counts: Count I, labeled "The Court Should Confirm and Enforce the Awards Under the New York Convention," and Count II, labeled "The Court Should Issue a Temporary Restraining Order." As the title suggests, Count II is not a claim for final relief, but rather a request for interim relief in the form of a temporary restraining order under Rule 65(b) that Noble included in its Petition. *See* FED. R. CIV. P. 65(b)(1).

Thus, the only claim for "final relief" that is "obtainable" in Noble's Petition is found in Count I. *Rosen*, 21 F.3d at 1528. In this claim, the Petition seeks relief in the form of (1) a judgment

"confirming and enforcing" the Arbitral Awards against Respondents, and retaining jurisdiction to enforce that judgment; (2) a judgment awarding Noble $5,000,000 as debt owed under the Facility Agreement, plus pre- and post-judgment interest, and HK$3,800,530.05 as costs (the same sums awarded to Noble in the Arbitral Awards); and (3) "such other relief as this Court deems just and proper, including costs."

None of this is equitable in nature. The Arbitral Awards that Noble seeks to confirm and enforce were issued as part of an arbitration brought by Noble to collect on the debt established by the Facility Agreement. As a secured creditor, Noble had two basic options upon Horn's default: it could foreclose on the lien it held against the AT&T settlement funds, or "ignore its security interest and obtain a judgment on the underlying obligation and proceed by execution and levy." 4 James J. White, Robert S. Summers, & Robert A. Hillman, *Uniform Commercial Code: Practitioner Treatise Series* § 34:7 (6th ed. 2023); *accord* 51 Am. Jur. 2d Liens § 79 (West 2023) ("Claims for enforcement of a lien are separate and distinct from an underlying breach of contract claim."); *id.* at § 79 n.6 ("Where there is a debt secured by a note, which is, in turn, secured by a lien, the lien and the note constitute separate obligations; thus, the right to recover on the promissory note and the right to foreclose may be enforced separately."). The actions associated with each option are distinct. An action to reduce the obligation established by the promissory note to judgment is one at law, and seeks a judgment against the debtor *in personam*, whereas a foreclosure action is equitable in nature, and the relief sought is *in rem*, "limited

to the property." *United States v. Alvarado*, 5 F.3d 1425, 1428-29 (11th Cir. 1993); *accord* 1 Dan B. Dobbs, *Dobbs Law of Remedies* § 2.6(3) (2d ed. 1993).

Significantly, in pursuing arbitration before the HKIAC Tribunal, Noble elected to obtain an award against Horn *in personam* on the underlying debt, rather than attempt to foreclose on its security interest. Counsel for Noble conceded this point at oral argument, Oral Argument at 16:08-17:00, and the HKIAC Tribunal confirmed as much in its Award:

> Claimant issued these proceedings for payment of a debt and/or damages for breach of contract against Respondent, and for related relief. On Claimant's case these are claims against Respondent *in personam*. The Tribunal agrees. The subject matter of this arbitration is not an *in rem* claim against the sums recovered for Respondent pursuant to the AT&T Action.

Accordingly, the Awards issued by the HKIAC Tribunal were legal, rather than equitable in nature. An action in district court to confirm and enforce an *in personam* award rendered by an arbitral panel remains the confirmation of an *in personam* award. *See EGI-VSR, LLC v. Coderch Mitjans*, 963 F.3d 1112, 1124-25 (11th Cir. 2020). Nor does Noble's generic request for "such other relief as this Court deems just and proper, including costs," transform the confirmation of an *in personam* award into an action seeking equitable relief. *See Rosen*, 21 F.3d at 1526 n.12 ("The mere incantation of

32                    Opinion of the Court                    22-11520

such boilerplate language does not convert a legal cause of action into a legitimate request for equitable relief.").

Put simply, when Noble filed its Petition in federal district court, it elected to pursue confirmation of several *in personam* awards that granted only legal relief. Noble did not attempt to foreclose on its lien -- whether before the arbitral panel, or before the district court, as Noble's counsel admitted during oral argument.[4] Oral Argument at 18:50-19:00. Nor, finally, did Noble assert any other claim that ultimately sought equitable relief.

In sum, Noble's Petition fails to invoke the equitable jurisdiction of the district court, and, therefore, the issuance of a preliminary injunction under Rule 65 was improper. *See Rosen*, 21 F.3d at 1528; *Mitsubishi*, 14 F.3d at 1520-21.

**2.**

Noble tries to resist this conclusion, offering two arguments. We remain unpersuaded.

First, Noble says that the existence of a lien against the AT&T settlement funds under the Security Agreement, standing alone, is sufficient to give the district court the equitable authority to issue preliminary injunctive relief under Rule 65. But the essential question is not whether a plaintiff has a lien against property; it is whether the plaintiff has sought to foreclose on that lien. *See Rosen*, 21 F.3d at 1529-30; *Mitsubishi*, 14 F.3d at 1518-19. Until and

---

[4] We take no position on whether Noble could successfully state a claim for foreclosure of its lien in the Southern District of Florida.

unless it has done so, Noble has not invoked the district court's equitable power.  Noble did not assert any equitable claim in this action.  It never moved to enforce its lien in the district court, or, as best we can tell, anywhere else.

Noble has not cited any case in support of its claim for equitable relief.  *See Deckert v. Indep. Shares Corp.*, 311 U.S. 282, 288, 290-91 (1940) (holding that preliminary injunction was warranted where "the bill state[d] a cause [of action] for equitable relief"); *United States v. First Nat'l City Bank*, 379 U.S. 378, 379, 385 (1965) (holding that preliminary injunction preventing dissipation of assets was warranted where plaintiff sought foreclosure of tax lien); *Grupo Mexicano*, 527 U.S. at 333 (holding that preliminary injunctive relief freezing defendants' assets was not warranted because injunctive relief was historically unavailable where plaintiff sought only money damages for breach of contract); *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 734 (11th Cir. 2005) (per curiam) ("[T]he asset freeze is justified as a means of preserving funds for the equitable remedy of disgorg[e]ment."); *United States v. Askins & Miller Orthopaedics, P.A.*, 924 F.3d 1348, 1361 (11th Cir. 2019) (affirming district court's preliminary injunction and expressly distinguishing *Rosen*, *Mitsubishi*, and *Grupo Mexicano* because "[h]ere, in contrast, the IRS's complaint asked for a permanent injunction providing prospective equitable relief for anticipated future violations -- the same relief sought by the preliminary injunction at issue.").

Second, Noble claims that, in any event, Rule 65 authorized preliminary injunctive relief because Noble's action seeks to

enforce a foreign arbitral award under a treaty of the United States. Granting a preliminary injunction, Noble asserts, would "serve[] the public interest because it [would] advance[] the strong federal policy favoring arbitration and the enforcement of arbitral awards, especially foreign arbitral awards in particular." Br. of Appellee at 35. But the question whether preliminary injunctive relief would serve the public interest has no bearing on whether the district court has the equitable power to enter such relief in the first place. Noble's claims remain legal claims, and that those claims were brought pursuant to the New York Convention, standing alone, does not convert them into claims sounding in equity.

The district court lacked the power to issue an order freezing the AT&T settlement funds pending judgment, and we must vacate the district court's entry of the preliminary injunction.

Accordingly, we **DISMISS** Respondents' appeal to the extent it challenges the district court's denial of their motion to dismiss, **VACATE** the district court's entry of preliminary injunctive relief, and **REMAND** the case for further proceedings consistent with this opinion.

**DISMISSED IN PART; VACATED AND REMANDED IN PART.**